UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
------------------------------------------------------ x
                                                       :
THEODORE ROOSEVELT POWELL               :          3:14 CV 1176 (JGM)
                                                       :
V.                                                     :
                                                       :
CAROLYN W. COLVIN                                      :
ACTING COMMISSIONER OF SOCIAL           :
SECURITY                                               :          DATE: SEPTEMBER 28, 2016
                                                       :
------------------------------------------------------ x
```

RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE
DECISION OF THE COMMISSIONER OR IN THE ALTERNATIVE MOTION FOR REMAND
FOR A HEARING, AND DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE
DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), as amended, seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"].

I.  ADMINISTRATIVE PROCEEDINGS

On October 6, 2011, plaintiff, Theodore Powell, filed an application for DIB claiming that he has been disabled since November 1, 1999 (Certified Transcript of Administrative Proceedings, dated January 28, 2015 ["Tr."] 158-59; see also Tr. 164-66, 193-200, 210-18) due to "motion disorder in both hands, right knee and ankle loss of motion/pain, issues at discs L2 [and] L4 and dyslexia." (Tr. 105; see also Tr. 93, 194, 230). Plaintiff's application was denied initially (Tr. 105-07; see also Tr. 92-97), and upon reconsideration. (Tr. 110-12; see also Tr. 98-104).[1] On May 23, 2012, plaintiff filed a request for a hearing by an Administrative Law Judge ["ALJ"](Tr. 113; see also Tr. 114-

_____

[1]Plaintiff has been represented by counsel since December 5, 2011. (Tr. 108-09; see also Tr. 219-29).

21, 230-34), and on February 20, 2013, plaintiff, his wife, and Vocational Expert ["VE"] Albert Sabella testified at a hearing held before ALJ Matthew Kuperstein. (Tr. 33-91; <u>see also</u> Tr. 122-53). Five days later, on February 25, 2013, plaintiff amended the date of his onset of disability from November 1, 1999 to January 1, 1992. (Tr. 235; <u>see also</u> Tr. 17). On April 16, 2013, the ALJ issued an unfavorable decision. (Tr. 14-28). On May 2, 2013, plaintiff requested a review of the hearing decision (Tr. 12-13; <u>see also</u> Tr. 7-11, 236-39), which the Appeals Council denied on June 17, 2014, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

On August 13, 2014, plaintiff filed his complaint in this pending action (Dkt. #1), and on February 19, 2015, defendant filed her answer, with the Administrative Transcript, dated January 8, 2015. (Dkt. #9).[2] On April 24, 2015, plaintiff filed his Motion for Order Reversing the Decision of the Commissioner or in the Alternative Motion for Remand for a Hearing and brief in support. (Dkt. #14; <u>see also</u> Dkts. ##12-13).  Defendant's Motion for an Order Affirming the Decision of the Commissioner and brief in support was filed on June 22, 2015 (Dkt. #15), and plaintiff's reply brief was filed on July 28, 2015 (Dkt. #16).

For the reasons stated below, plaintiff's Motion for Order Reversing the Decision of the Commissioner (Dkt. #14) is **<u>denied</u>**, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #15) is **<u>granted</u>**.

---

[2]There is some duplication in the record.

## II. FACTUAL BACKGROUND

## A. HEARING TESTIMONY AND ACTIVITIES OF DAILY LIVING[3]

Plaintiff was born in 1954, and thus was thirty-seven years old on January 1, 1992, his alleged onset date of disability. (Tr. 40). He is married with three adult children (Tr. 42), has a college degree in business management, and around 1999,[4] would read the local newspaper every day (Tr. 45); however, he has trouble writing because of his dyslexia and he listened to audio versions of his textbooks while obtaining his degree. (Tr. 45, 61). Plaintiff worked for Electric Boat from 1973 until 1991, during which time he was employed in various positions within the company. (Tr. 48). When he was terminated in 1991, he was working as the "assistant superintendent in the paint department[]" (Tr. 48), in which position he was not required to perform physical work but would "tour the site[]" and manage the employees who reported to him. (Tr. 60). He would also review "the progress books[]" at night, which he could manage despite his dyslexia because he was not required to write or type. (Id.). Plaintiff claims to have injured his hands while working at Electric Boat due to his use of vibrating equipment without proper safety equipment. (Tr. 48-49).

Although plaintiff was still able to perform this work, he was laid off from the company in 1991, along with five other employees in his group. (Tr. 49). After his termination, plaintiff applied for numerous positions but was unable to obtain employment

---

[3]Plaintiff completed an Activities of Daily Living Form on October 17, 2011. (Tr. 177-84). However, this form captures plaintiff's daily activities in 2011 and is not relevant to his abilities prior to his date last insured, June 30, 2000.

[4]The hearing occurred prior to plaintiff amending his alleged onset date from November 1, 1999 to January 1, 1992. (See Tr. 235). Therefore, the ALJ questioned plaintiff about his impairments and daily activities during 1999. (Tr. 40-42).

in his field. (Tr. 49-50). Plaintiff found work from 1995-99 as a gas station cashier and as a substitute teacher (Tr. 46-47, 50; see also Tr. 186-92, 201-09); however, he was not able to stay in either of these positions because issues with his hands prevented him from effectively teaching industrial arts classes (Tr. 47), and his inability to stand for long periods of time left him unable to work as a gas station cashier. (Tr. 46, 61-62). Plaintiff stopped working in 1999 but did not apply for disability benefits at that time because he hoped his conditions would improve. (Tr. 55).

Plaintiff was able to drive to and from his employment at Electric Boat in the early 1990s "before [his] injuries got bad," but by 1999, he drove less frequently, mainly to the local school system where he worked as a substitute teacher. (Tr. 44). Plaintiff believes that he would have had trouble handling paperwork around 1999 because of his dyslexia and because the numbness in both of his hands would cause him to drop things. (Tr. 51-52, 59). His hands would also become painful and develop white spots when the weather became cold or fluctuated. (Tr. 51-52, 59-60). Plaintiff claims that his doctors have consistently told him that there is no treatment available that would improve the condition of his hands. (Tr. 58).  Since 2000 or possibly earlier, plaintiff has needed to wear a back brace when he "do[es] any kind of lifting at all," he has worn an ankle brace since 1976, and he has occasionally worn knee braces since 1992 or 1993. (Tr. 52-53). He has received injections in his ankles and knees but not in his back. (Tr. 65). As of 1999, he took no medications other than Aspirin, Tylenol, or vitamins. (Tr. 53).

Around 1999, as plaintiff reported to one of his treating doctors, he would perform housework for about one hour per day, care for his children for about three to four hours per day, do yard work about one hour per day, walk one hour per day, shop and run

errands two hours per day, visit friends three hours per day, watch television for a half hour or less per day, read one hour per day, and take care of animals and do some goat milking and fence repair work for about three hours per day. (Tr. 53-54). However, in order to accomplish these tasks, plaintiff had to "pace [him]self out[,]" take frequent breaks, sometimes ask for help, and perform some activities, such as feeding the farm animals, at a slow pace. (Tr. 56-57). At the time, plaintiff could only lift about fifteen to twenty pounds, could stand for two to two and a half hours, and could walk "in spurts[]" for an hour to two if he was occasionally allowed to sit and rest. (Tr. 57-58). If plaintiff stood for two and a half hours, he would then need to sit for up to half an hour to recover. (Tr. 61-62). In the early 1990s plaintiff weighed two hundred and thirty pounds but by 1999 his weight had increased to two hundred and ninety-eight pounds. (Tr. 54-55).

Plaintiff's wife also testified that during the late 1990s, plaintiff's difficulties with his hands limited his ability to perform work. (Tr. 68-69). She believed he would have been unable to perform even sedentary work because he lacked the dexterity to do so. (Tr. 70). She also noted that plaintiff's dyslexia hindered his ability to find employment because he could not complete employment applications without making errors (Tr. 69), and that around 1999, plaintiff was no longer able to maintain their home. (Tr. 70-71).

At the hearing, VE Albert Sabella explained that plaintiff's previous work at Electric Boat and as a substitute teacher would be categorized as light and skilled, and his work as a gas station attendant would be light and unskilled. (Tr. 72). VE Sabella opined that a hypothetical individual with no exertional limitations, but who would have difficulty with prolonged standing or walking and who would be unable to do work that involved

5

moderate exposure to vibrations, could not have concentrated exposure to pulmonary irritants such as fumes, odors, dust, and gas, and who would have difficulty doing work that involved more than occasional paperwork would not be able to perform any of plaintiff's previous positions, but would be able to perform sedentary work such as assembly type work and machine tending positions. (Tr. 73-74). If the same individual was further limited to only frequent handling, fingering, and feeling, he could still perform both of these positions, but if he was limited to occasional handling, fingering, and feeling, he would not be able to perform this or any other work. (Tr. 74-75, 88). If the same individual could stand and walk up to six hours in an eight hour work day, but only for two hours at a time, then the individual would be able to perform light, unskilled work such as a small products assembler or an inspector. (Tr. 75-87). If the same individual was also off task fifteen percent of the time in order to stand and stretch, or sit down and relax, then he would not be able to perform any positions. (Tr. 88-89).

###### B. PRIOR BENEFIT DETERMINATION

On January 2, 1996, ALJ David DiNardi approved a settlement agreement that compensated plaintiff under the Longshore and Harbor Workers' Compensation Act due to plaintiff's "work-related injury diagnosed as hand/arm vibration disease[.]" (Tr. 278-79, 391-92; see also Tr. 274-77, 387-90).

###### C. MEDICAL RECORDS

The medical records in the administrative transcript begin in December 1973 (Tr. 350, 353) and cover a nearly forty year period through January 2013 (Tr. 546); however, the majority of these records are from before or after the relevant time period, do not relate to plaintiff's conditions during the relevant time period, do not discuss plaintiff's

alleged impairments, or are duplicative. While the Court has reviewed all of these records, this decision will focus primarily on plaintiff's medical records from the time of his alleged onset date of disability, January 1, 1992, through his date last insured, June 30, 2000. Similarly, this decision will not address medical records during the relevant time that do not relate to plaintiff's alleged causes of disability. (See, e.g., Tr. 438-39 (testing for Lyme Disease)). However, due to the scarcity of relevant treatment records during the time in question, the Court will discuss any medical records that may shed light on his condition during that time.

### 1. SLEEP APNEA

The only record relating to plaintiff's sleep apnea is a November 26, 1996 sleep study in which plaintiff participated due to his sleep apnea, loud snoring, and daytime drowsiness. (Tr. 270-73). The testing revealed a moderate degree of obstructive sleep apnea but noted that plaintiff's "[s]leep architecture" was "relatively well preserved." (Tr. 271).

### 2. LOWER EXTREMITIES AND BACK

While there are no medical records showing the treatment plaintiff received during the relevant time, there are fairly brief medical records (often one page or less) prior to the alleged onset of disability, which indicate that plaintiff had a history of injuries to his left ankle in 1978-80, 1982-84, and 1988-90 (Tr. 332-47), right ankle in 1974, 1978-79, 1982-84, 1986, 1988 and 1990 (Tr. 354-75, 407-11), left knee in 1973 and 1991 (Tr. 348-53), right knee in 1974 and 1988-89 (Tr. 421-25), and shoulder and back in 1976, 1983 and 1990.  (Tr. 412-20, 429-30). After his date last insured, plaintiff continued to receive some treatment in 2013 for his back (Tr. 652) and ankle. (Tr. 638-39). On January 16,

7

2013, plaintiff was examined by Dr. Nicole Arcand, an orthopedic surgeon (Tr. 638-39), to whom plaintiff reported that he had always had some ankle pain but that it had been growing worse over the past five years; despite this increase in severity, plaintiff rated his ankle pain as a one out of ten. (Tr. 638). Dr. Arcand diagnosed plaintiff with severe arthritis in the ankle and recommended a lace up ankle brace and an orthotic; at the time of the appointment, plaintiff "currently [was] not wearing a brace at all." (Id.). Dr. Arcand concluded that "[a]lthough his symptoms have been worsening it is not debilitating for him at this time." (Id.).

### 3. UPPER EXTREMITIES

On April 11, 1988, plaintiff reported to his employer's onsite medical team that beginning on March 28, 1988, he experienced pain and numbness in his hands. (Tr. 300). It was suspected that plaintiff was experiencing White Finger Syndrome ["WFS"] and, after the symptoms continued, plaintiff eventually saw a doctor outside of the work clinic. (Tr. 300-01). Plaintiff was restricted from working with vibrating tools from June 6 until July 5, 1988. (Tr. 301).[5] Over twenty years later, on June 14, 2011, plaintiff was seen at Middlesex Hospital for pain in his right hand after he had jammed his finger; an examination of his right hand revealed "some chronic osteoarthritic change[]" but no mention was made of plaintiff's WFS. (Tr. 464). On October 11, 2011, an examination of

---

[5]On April 11, 1991, plaintiff cut his left finger while on the job. (Tr. 319). On May 7, 1991, plaintiff slipped and hit his wrist on a zinc tank, resulting in numbness in the fingers of his right hand; upon examination, his fingers demonstrated a good range of motion and were warm to the touch. (Tr. 318). There is no mention of plaintiff's alleged WFS in the treatment notes for either of these injuries.

plaintiff's extremities revealed a normal range of motion, no tenderness or edema, and no evidence of injury. (Tr. 497).[6]

On January 4, 2012, plaintiff reported to Dr. Stephen Kaye, his then primary care physician (Tr. 524-25), that he was sedentary "because of ortho[pedic] problems for which he is currently seeking disability and [workers'] compensation[.]" (Tr. 524). He requested a consultation for his hand vibration syndrome[7] and complained of back pain, joint pain, limited range of motion, muscle aches, and stiffness (id.); Dr. Kaye noted that plaintiff's orthopedic complaints were "subjective[.]" (Tr. 525). On January 10, 2012, plaintiff was referred by Dr. Kaye for an orthopedic consultation with Dr. Tarik Kardestuncer, an orthopedic surgeon; at this consultation plaintiff reported that he had experienced numbness and tingling in his hands "for many years[,]" that he drops things, feels weakness in his hands, has been seen by a doctor for over a decade for the problem,[8] and "was told years ago that nothing could be done." (Tr. 633-34). Dr. Kardestuncer found mild numbness and mildly positive median nerve compression in both of plaintiff's hands. (Tr. 634). On January 13, 2012, plaintiff underwent additional testing with Dr. Mohammed Pasha, another orthopedic surgeon, who noted that plaintiff had been using wrist splints with minimal improvement and that plaintiff had been diagnosed with carpal tunnel syndrome about twenty years prior to the appointment. (Tr. 635). Dr.

---

[6]At this appointment on October 11, 2011, it was noted that plaintiff "[f]eels well active with yard work." (Tr. 496-97). Similarly, on September 30, 2011, plaintiff reported that he was a farmer and denied any issues with joint pain or swelling. (Tr. 500).

[7]Hand-arm vibration syndrome is synonymous with WFS. Hand-arm Vibration Syndrome, Patient, http://patient.info/health/hand-arm-vibration-syndrome-leaflet (last visited September 26, 2016)(Hand-arm vibration syndrome "causes symptoms in fingers, hands and arms, as a result of using vibrating tools. It used to be called vibration white finger.").

[8]The administrative transcript contains no record of this decade of treatment.

Pasha found positive Tinel's and Phalen's signs bilaterally, upper extremity strength of five out of five, and deep tendon reflexes of two out of four. (Id.). After reviewing Dr. Pasha's findings (Tr. 636), on January 24, 2012, Dr. Kardestuncer diagnosed plaintiff with bilateral carpal tunnel syndrome of moderate degree. (Tr. 637). He concluded that plaintiff's "hands are okay. They have not changed at all. There is no numbness in the mornings, typically. Occasionally, when the weather gets cold, his hands go numb[;]" he also concluded that plaintiff's moderate carpal tunnel syndrome "has not gotten worse in the last [ten] to [twenty] years. It has not changed much and it does not bother him much." (Id.).[9]

D. MEDICAL OPINIONS/EXAMINATIONS

On December 4, 1996, Dr. S. Pearce Browning, III, an orthopedic surgeon who claimed to have previously seen plaintiff for hand-arm vibration syndrome,[10] examined plaintiff; he summarized his findings in a letter to plaintiff's attorney[11] four days later. (Tr. 282-83, 393-94, 398-99; see also Tr. 395, 401-04). In this letter, Dr. Browning recounted that plaintiff's right knee was injured on May 5, 1989 and "grinds a little bit but it does not have a major meniscal snap or pop. The ligaments, both collaterals and cruciates, are stable; it is not hot, red, swollen, or tender. The x-rays of the right knee do not show any major arthritic change, deformity or other problem." (Tr. 282, 393, 398). Plaintiff's left knee was not injured, the x-rays showed no damage, but it did "ache with the weather."

---

[9]Plaintiff continued to see Dr. Kaye regarding his hands, among other medical issues, from March 2012 through January 2013. (Tr. 520-22, 608-20).

[10]There is no record of this previous meeting in the administrative transcript and it is not clear if Dr. Browning treated plaintiff for this condition or merely examined him. (Tr. 282, 393, 398).

[11]Plaintiff was represented by different counsel at this time.

(Id.). Dr. Browning also noted that plaintiff had suffered "multiple injuries to the ankles," and that his right ankle was "a bit swollen," showed tenderness at the medial malleolus, and x-rays showed "that there has probably been multiple avulsion fractures there. There also is a significant anterior spur on the talus, and also very early calcaneal spurs on the os calcis on the bottom into the plantar fascia and also into the Achille's tendon." (Tr. 282-83, 393-94, 398-99). His left ankle showed a similar spur on the talus but no evidence of "old avulsion fractures on the left medial malleolus and no spur on the os calcis." (Tr. 283, 394, 399). Dr. Browning mentioned plaintiff's history of attention deficit disorder[12] and dyslexia, but noted that it did not prevent him from working or obtaining a college degree. (Tr. 282, 393, 398). However, he determined that "there is no question that his total overall impairment is materially and substantially greater because of his dyslexia." (Id.).

On July 26, 1998, Dr. Browning wrote another letter to plaintiff's attorney[13] in which he opined that plaintiff had issues with his right knee and both ankles (Tr. 280, 396); an attached office note assigned plaintiff's right leg a fifteen percent disability and his left leg an eight percent disability. (Tr. 281, 397).

On May 14, 1999, plaintiff was examined by Dr. Philo F. Willetts, Jr., also an orthopedic surgeon, for his complaints of pain in his right knee and right ankle. (Tr. 287-97, 376-86, 440-50). Plaintiff informed Dr. Willetts that he first injured his knee in 1989 while on the job, and was ultimately diagnosed with a swollen knee and placed in a knee wrap; plaintiff reportedly was told that surgery would not help his condition and, at the

---

[12]The Court can find no other references to plaintiff suffering from attention deficit disorder in the administrative transcript.

[13]See note 12 supra.

11

time of his examination with Dr. Willetts, had not received treatment on his knee for years. (Tr. 287-88, 376-77, 440-41). Plaintiff claimed that he used a heating pad, walked for a total of about one mile per day for exercise, took aspirin twice per day, and took Tylenol once per day, but neither his right knee nor ankle had improved. (Id.). Plaintiff explained that his knee felt stiff "on occasion[,]" he had increased pain with squatting and with wet weather, and he occasionally felt a lump over the front of his knee; however, his knee caused him no instability, did not cause him to fall, and had no locking, clicking, or snapping. (Tr. 288, 377, 441). Plaintiff claimed that he could sit or stand for one hour, could drive for two hours, and could walk for one mile; he reported no injuries to his right knee since the original 1989 injury. (Tr. 289, 378, 442). An inspection of the right knee showed it to be normal and plaintiff reported no tenderness but some discomfort with certain maneuvers. (Tr. 290-91, 379-80, 443-44).

Plaintiff also stated that in 1990 he twisted and fractured his right ankle while working and was placed in a cast and administered a Cortisone injection; he was out of work for about four weeks due to this injury and was reportedly told that nothing else could be done to improve the injured ankle. (Tr. 288, 377, 441). Plaintiff elaborated that he had injured his ankle numerous times before the 1990 incident and had been wearing an ankle brace for sports prior to this time. (Tr. 289, 378, 442). A physical examination of plaintiff's ankles showed that they were normal to inspection with some tenderness reported over the medial right ankle but none about the foot or lower leg and no tenderness in the left ankle. (Tr. 291, 380, 444). Plaintiff believed that at the time of the appointment, he would not be able to perform his past work at Electric Boat because "he would have difficulty standing the long hours." (Tr. 289, 378, 442). Finally, plaintiff

reported that he "was positive . . . for [WFS]" and had lifelong dyslexia; at the time, he was taking aspirin, Tylenol, and vitamins. (Tr. 289-90, 378-79, 442-43). Plaintiff was overweight but did not drink alcohol or smoke. (Tr. 290, 379, 443).

As discussed at his hearing before the ALJ (Tr. 53-54), plaintiff reported to Dr. Willetts that he did housework for about one hour per day, cared for his children three to four hours per day, did yard work about one hour per day, walked one hour per day, shopped and ran errands two hours per day, visited friends three hours per day, watched television for a half hour or less per day, read one hour per day, and took care of animals and did some goat milking and fence repair work for about three hours per day. (Tr. 290, 379, 443). A physical examination reflected that plaintiff was "a pleasant man in no distress[]" who walked initially with a significant right limp initially but "then smoothed out to a mild limp after several steps." (Id.). Dr. Willetts reviewed the x-rays taken by Dr. Browning on January 24, 1996, and interpreted them to show some issues with plaintiff's right ankle, but that his feet, knees, and left ankle were all normal. (Tr. 292, 381, 445).

Dr. Willetts opined that plaintiff was not disabled by virtue of his knee or ankles. (Tr. 293-94, 382-83, 446-47). Dr. Willetts acknowledged plaintiff's lifelong dyslexia and reported diagnosis of WFS, but still found that "he could work without restriction. . . . [but] might experience some discomfort were he to do prolonged standing or walking, but he would be capable of doing that." (Tr. 294, 383, 447). Dr. Willetts found that plaintiff had no impairment of the right lower extremity that could be attributed to his right knee, but a thirteen percent permanent partial physical impairment in his right foot and an eight percent permanent partial physical impairment in his left foot. (Tr. 295, 384, 448). Dr.

13

Willetts found that plaintiff's lifelong dyslexia "has been significantly disabling in the work place." (Tr. 296, 385, 449).

On August 2, 2012, Karla Benavides reviewed plaintiff's medical records for SSA and determined that plaintiff had a "history of injuries prior to [the] period under adjudication[,]" but there was "insufficient objective [medical evidence of record] to assess [the] period [of] 11/01/99 to 6/30/2000." (Tr. 535).[14]

### III. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. See id. Furthermore, the Commissioner's findings are conclusive

---

[14]This review occurred prior to plaintiff amending his alleged onset date.

14

if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).[15]

## IV. DISCUSSION

ALJ Kuperstein determined that plaintiff's earning record demonstrated that he last met the insured status requirements of the Social Security Act on June 30, 2000 (Tr. 19; see also Tr. 155-57, 162-63, 167-76), and that plaintiff had not engaged in substantial gainful activity from January 1, 1992, his alleged onset date, through June 30, 2000, his date last insured. (Tr. 19-20, citing 20 C.F.R. § 404.1571 et seq.). The ALJ also found that plaintiff suffered from the severe impairments of "obesity and degenerative joint disease of the right knee and bilateral ankles[.]" (Tr. 20, citing 20 C.F.R. § 404.1520(c)). ALJ Kuperstein found that plaintiff's WFS, sleep apnea, and dyslexia were not severe impairments. (Id.). He then determined that, through the date last insured, plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R.

---

[15]An ALJ determines disability using a five-step analysis. See 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. § 404.1520(a)(4)(I). If the claimant is currently employed, the claim is denied. Id. If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. See 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. See 20 C.F.R. § 404.1520(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. See 20 C.F.R. § 404.1520(a)(4)(iii); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. See 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. See 20 C.F.R. § 404.1520(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

Part 404, Subpart P, Appendix I (Tr. 20-21, <u>citing</u> 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526), and that, through the date last insured, plaintiff had the Residual Functional Capacity ["RFC"] to perform a full range of work at all exertional levels but that plaintiff "would have difficulty with prolonged standing or walking[,]" he "should avoid concentrated exposure to pulmonary irritants, such as fumes, odors, dust and gases and moderate exposure to vibration[,]" and that his position "should not involve more than occasional paperwork throughout the workday or more than frequent handling, fingering, and feeling." (Tr. 21-26). Next, ALJ Kuperstein found that plaintiff was unable to perform his past relevant work (Tr. 26, <u>citing</u> 20 C.F.R. § 404.1565), he was defined as a younger individual on the date last insured (<u>id.</u>, <u>citing</u> 20 C.F.R. § 404.1563), he has at least a high school education and is able to communicate in English (<u>id.</u>, <u>citing</u> 20 C.F.R. § 404.1564), and the transferability of his job skills was not material to the determination of disability. (<u>Id.</u>). Finally, the ALJ concluded that, through the date last insured, jobs existed in significant numbers in the national economy that plaintiff could have performed (Tr. 27, <u>citing</u> 20 C.F.R. §§ 404.1569 and 404.1569(a)), and therefore plaintiff was not under a disability between January 1, 1992 and June 30, 2000. (<u>Id.</u>, <u>citing</u> 20 C.F.R. § 404.1520(g)).

Plaintiff seeks an order reversing or remanding the decision of the Commissioner on the grounds that the ALJ committed a number of factual errors as well as misstatements, distortions, and mischaracterizations of the evidence (Dkt. #14, Brief at 7-10); plaintiff has a listed impairment (<u>id.</u> at 10-12); the ALJ failed to properly follow the treating physician rule (<u>id.</u> at 12-14); the ALJ failed to properly evaluate and assign weight to the finding of disability issued by an ALJ under the Longshore and Harbor Worker's

Compensation Act (id. at 14); the ALJ did not properly determine plaintiff's credibility (id. at 14-15); the ALJ failed in his RFC determination (id. at 15-18); and defendant has failed to meet her burden of proof at Step Five (id. at 18-19).[16] (See also Dkt. #16, at 1-3). Defendant counters that the ALJ accurately stated the evidence of record (Dkt. #15, Brief at 4-6), plaintiff did not satisfy the listing requirements for WFS (id. at 6-7), the ALJ properly considered Dr. Browning's opinion (id. at 8), the ALJ properly considered plaintiff's Workers' Compensation Benefits (id. at 9), the ALJ properly considered plaintiff's credibility (id. at 10-11), the ALJ properly considered plaintiff's RFC (id. at 11-13), and plaintiff has not met his burden of proof to show total disability (id. at 13).

### A. FACTUAL ERRORS

Plaintiff claims that the ALJ committed factual errors when describing plaintiff's conditions by stating that he did not receive treatment for WFS, that he had achieved "academic success[,]" and that the results of his sleep study were normal. (Dkt. #14, Brief at 8-9).

#### 1. TREATMENT FOR WFS

Plaintiff argues that the ALJ erred when he stated that plaintiff "did not receive treatment for [WFS], and as a result the ALJ found this to be a non-severe impairment." (Id. at 8). While plaintiff acknowledges that the ALJ's statement was factually accurate, he claims that the statement is "misleading" because plaintiff's WFS is an "untreatable condition[.]" (Id.)(footnote omitted). Plaintiff also claims that this misleading comment prejudiced plaintiff "because it allowed the ALJ to find [plaintiff's WFS] a non-severe

---

[16]The Court's ability to analyze portions of plaintiff's briefs was hindered by an abundance of typographical errors which render some sentences nearly incomprehensible. (See, e.g., id. at 17 ("The the ALJ did must include[]"), Dkt. #16, at 2 ("At that point is was notes that [plaintiff's] condition is a 'disorder[] associates with repeated trauma[.]'")).

impairment, and to justify its exclusion from [plaintiff's RFC] determination." (Id.). The Court finds that plaintiff's arguments on this point are misinformed at best and disingenuous at worst.

First, plaintiff inexplicably supports his contention that his WFS cannot be treated by citing a source which, as defendant points out, lists a number of potential treatment options. (Dkt. #14, Brief at 8, n.1, citing Hand-arm vibration syndrome (HAVS), Sami Youakim, MD, BC Medical Journal, Vol. 51, No. 1, January, February 2009 (recommending mitigation of risk factors, therapy, and the use of "antihypertensive medications such as calcium channel blockers[]" as treatment options); see also Dkt. #15, Brief at 5 ("Plaintiff supports his argument [that WFS cannot be treated] with a single footnote to the BC Medical Journal, which ironically states the exact opposite and describes a range of treatment options[.]")). Defendant also provides a number of additional treatment options that appear on the Mayo Clinic's website, including nerve surgery and chemical injection. (Dkt. #15, Brief at 5 & n.3, citing Raynaud's disease – Treatment and drugs, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/raynauds-disease/basics/treatment/con-20 022916 (last visited September 26, 2016)).[17]

In his reply brief, plaintiff attempts to clarify his argument and claims that defendant misunderstands plaintiff's WFS because defendant "relies on an article about the early stages of Reynaud's [sic] phenomenon ['Raynaud's'[18]] symptoms" when plaintiff

---

[17]Defendant's brief also mentioned beta blockers, but the Mayo Clinic website specially recommends against beta blockers; the website, however, does includes calcium channel blockers, alpha blockers and vasodilators as medications that "may help treat Raynaud's[,]" which medications were not included in defendant's brief.

[18]WFS is a form of Raynaud's and "is a term used when secondary Raynaud's has been caused by vibration." Raynaud's phenomenon – Causes, NHS Choices,

suffers from "a much more extreme and advanced illness[]" that, unlike the early stages of Raynaud's, cannot be treated. (Dkt. #16, at 1). However, the article that plaintiff denigrates defendant for relying upon is the same article that plaintiff previously introduced as his sole support for his contention that WFS is an untreatable condition. (Dkt. #14, Brief at 8, n.1; see Dkt. #15, Brief at 5, n.2). If plaintiff is correct that this article deals only with the early stages of Raynaud's and is not relevant to his condition, then it is not clear why plaintiff chose to rely upon it originally.

Also, plaintiff cites to no medical records that show that his condition was severe. Instead, plaintiff claims that his condition cannot be treated because "'[i]f Raynaud's is severe -- which is rare -- blood circulation to your fingers or toes could permanently diminish, causing deformities of your fingers or toes. . . . In extreme untreated cases, your doctor may need to remove the affected part of your body (amputation)." (Dkt. #16, at 1-2, citing Raynaud's disease – Complications, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/raynauds-disease/basics/complications/con -20022916 (last visited on September 26, 2016)).[19] Although plaintiff claims to be referring to a discussion of the causes of this condition, he, in fact, is quoting the section of the website that discusses complications associated with Raynaud's.  Even if the Court

_____

http://www.nhs.uk/Conditions/Raynauds-phenomenon/Pages/Causes.aspx (last visited on September 26, 2016).

[19]The Mayo Clinic's website explains that the difference between Primary and Secondary Raynaud's is that Primary Raynaud's is not the result of "an underlying associated medical condition[,]" while Secondary Raynaud's "is caused by an underlying problem[]" such as repetitive action or vibration. Raynaud's disease–Causes, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/raynauds-disease/basics/causes/con-20022916 (last visited on September 26, 2016). While Secondary Raynaud's "tends to be more serious" than primary Raynaud's, the distinction between the two is related to the cause of the condition, and is not reflective of whether Raynaud's is in an early or late stage (id.); it is not clear if plaintiff appreciates this distinction.

was willing to accept plaintiff's unsupported statement that he is suffering from a severe case of Raynaud's, which it is not, contrary to plaintiff's claims, the treatment section of the Mayo Clinic's website still lists potential treatment options for severe cases of the disease. <u>Raynaud's disease — Treatment and drugs</u>, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/raynauds-disease/basics/treatment/con-20 022916 (last visited on September 26, 2016)("Medications are available to treat more-severe forms of the condition.")("For some cases of severe Raynaud's, approaches other than medications may be a treatment option.").

As explained above, plaintiff's argument regarding this topic was severely flawed and contained several internal inconsistencies. Distilled down, plaintiff's original argument consisted of the bold claim that WFS cannot be treated, an assertion which plaintiff bizarrely supported with a citation listing multiple treatment options. Then, when defendant challenged this contradiction and provided further evidence of additional treatment options, plaintiff changed his argument to claim that severe forms of the condition, which he claimed to suffer from, could not be treated. In addition to citing no evidence in the record to show that plaintiff's condition was severe, he also continued to ignore evidence discussing treatment options for severe forms of the condition.

The Court struggles to believe that in drafting his brief, plaintiff was not aware of the multiple treatments for Raynaud's, including treatments for severe cases, listed under the "Treatments and drugs" section of the Mayo Clinic's website. Plaintiff selectively quoted both the "Causes" and "Complications" sections of the same website in his reply brief while ignoring the section of the website cited by defendant regarding treatment, the

issue in dispute. Therefore, for the reasons stated above, the Court finds that the ALJ did not err when he stated that plaintiff had not received treatment for his WFS.

### 2. ACADEMIC SUCCESS

Next, plaintiff claims that the ALJ committed a factual error when he stated that plaintiff has enjoyed "academic success[.]" (Dkt. #14, Brief at 8-9). Plaintiff claims that he did not have academic success because Dr. Willetts believed that plaintiff's dyslexia was "significantly disabling in the workplace[,]" and because he was only able to finish a college credit program in which he was allowed to use audio recordings instead of written textbooks in a program organized and supervised by his employer. (Id.).

As defendant points out (Dkt. #15, Brief at 5-6), despite the fact that plaintiff required accommodations, he was able to obtain a Bachelor's Degree in business management. (Tr. 45). Additionally, plaintiff testified that he read often (id. ("I read the sports page every day. I read the local newspaper every day.")), and that he stopped working as a substitute teacher because he was assigned to industrial arts classes, but that he could have taught an English or science class. (Tr. 47). Considering that plaintiff obtained a four year degree, read daily, and felt comfortable substitute teaching an English class, the Court finds that the ALJ did not err when he stated that plaintiff has had academic success.

### 3. SLEEP STUDY

Finally, plaintiff claims that the ALJ committed a factual error by finding that plaintiff's sleep study was normal. (Dkt. #14, Brief at 9). Plaintiff is incorrect. The ALJ did not state that plaintiff's sleep study was normal; rather, he correctly stated that the sleep study was abnormal but did not find it to be a severe impairment because he displayed

only moderate symptoms and did not receive further treatment. (Tr. 20). Therefore, the ALJ did not err on this point.

B. LISTING 1.02B

Plaintiff claims that his hand condition equals Listing 1.02B because he "cannot perform fine motor tasks as a result of constant numbness in his hands and upper and lower wrists[,]" his "hands develop white sports [sic] 'all through them[,]'" he experiences pain in his hands, he has trouble handling "even very light-weight material like paperwork because of his hand numbness[,]" his hand numbness prevents him from picking up objects he is not looking at "because he cannot feel in order to grasp [such objects,]" he experiences increased pain during cold months or when the weather changes, and he "reports dropping something every day due to the numbness and pain in his hands." (Dkt. #14, Brief at 11-12).

Before analyzing whether plaintiff's conditions satisfy Listing 1.02B, the Court notes that plaintiff's unsupported assertion[20] that he "drop[s] something every day due to the numbness and pain in his hands[]" is incorrect. (Id. at 12). Plaintiff did not testify that he dropped something every day; to the contrary, when plaintiff's counsel asked how often plaintiff would drop things, he responded that "[i]t depends." (Tr. 59).[21]

---

[20]About half of the limitations plaintiff lists in this section of his brief are not supported by citations to the record. (See Dkt. #14, Brief at 11-12).

[21]Similarly, although plaintiff claims that his "hands develop white sports [sic] 'all through them[,]'" that he "experiences a 'great amount of pain in them[,]'" and that he "experiences pain during cold months or at the time of any weather changes[,]" (id.), the Court notes that plaintiff never stated that his pain was a constant problem.  Rather, when asked how frequently he experienced pain in his hands, he testified that he only experienced pain and white spots when the weather changed or was cold. (Tr. 59 ("I get pain in my hands every time it gets cold weather or the weather changes. My hands ache. They get, like, white spots onto them."); see also Tr. 51 ("[W]hen the weather changes, my hands get white all through them, and I feel a great amount of pain in them.")).

Turning to plaintiff's argument, the Court finds that, based on the sparse medical evidence in the record, plaintiff's hand impairment does not meet the requirements of Listing 1.02B.[22] To meet Listing 1.02B, a claimant must first demonstrate a major dysfunction of a joint "[c]haracterized by gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitations of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02. A claimant must then show "[i]nvolvement of one major peripheral joint in each upper extremity . . ., resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c[.]" Id. at § 1.02(B). An "[i]nability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." Id. at § 1.00(B)(2)(c).

Plaintiff has failed to satisfy these requirements. Plaintiff has provided no "findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)[]" id. at § 1.02, and there is little evidence regarding plaintiff's WFS other than his own testimony. He was first suspected of having WFS in 1988 after he reported pain and numbness in his hands to his employer's onsite medical

---

[22]Listing 1.02B deals with impairments of the musculoskeletal system, specifically a major dysfunction of a joint. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02. However, after defendant highlighted that plaintiff has denied experiencing any muskuloskeletal or joint problems (Dkt. #15, Brief at 7), plaintiff claimed, without citing supporting evidence, that WFS "is a neurological problem, so [plaintiff's] failure to say that he has joint or musculoskeletal problems . . . is irrelevant." (Dkt. #16, at 2). The Listings are clear that "[i]mpairments with neurological causes are to be evaluated under 11.00ff." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(1). Therefore, if the Court accepts plaintiff's argument that WFS is a neurological issue, then there is no need to analyze whether his conditions met Listing 1.02B.

staff. (Tr. 300-01). About two months later, he was restricted from working with vibrating tools for one month. (Tr. 301). Although plaintiff returned to the same onsite medical facility multiple times over the next few years (Tr. 302-75), and occasionally received treatment for unrelated hand injuries (Tr. 318-19), there are no additional notes concerning plaintiff's suspected WFS.

During the alleged period of disability, Dr. Willetts stated that plaintiff "was said to be positive for white finger[]" and "ha[d] been evaluated for white finger[]" (Tr. 289, 294, 378, 383, 442, 447); however, Dr. Willetts did not personally diagnose plaintiff with this condition and did not note any limitations that it may have caused. Similarly, while Dr. Browning references having previously seen plaintiff for WFS, he provides no further details about this history. (Tr. 282).

Records from after plaintiff's date last insured are also unhelpful. On January 4, 2012, plaintiff requested a consultation for WFS, and, after a consultation and testing (Tr. 633-37), it was determined that the numbness and tingling in his hands were due to moderate bilateral carpal tunnel syndrome. (Tr. 636-37). The consulting doctor concluded that plaintiff's "hands are okay. They have not changed at all. There is no numbness in the mornings, typically. Occasionally, when the weather gets cold his hands go numb[,]" and he found that plaintiff's condition "has not gotten worse in the last [ten] to [twenty] years. It has not changed much and it does not bother him much." (Tr. 637). Therefore, plaintiff has failed to provide evidence to demonstrate that he satisfies the criteria of Listing 1.02B during the relevant time period.

C. TREATING PHYSICIAN RULE

Plaintiff claims that the ALJ violated the treating physician rule by not assigning weight to the December 1996 opinion of Dr. Browning. (Dkt. #14, Brief at 12-14; Dkt. #16, at 2-3).[23]

As an initial matter, the Court notes that it is not clear that Dr. Browning had a treating relationship with plaintiff. The record shows only that Dr. Browning examined plaintiff in December 1996 and July 1998. (Tr. 281-82, 393, 397). While Dr. Browning noted that he had seen plaintiff previously, the record does not show if there was a treating relationship or merely a previous examination. (Id.).[24] However, because the ALJ stated that Dr. Browning treated plaintiff, the Court will consider whether the ALJ violated the treating physician rule.

The treating physician rule generally requires an ALJ to give "special evidentiary weight" to the medical opinion of a claimant's treating physician. Clark v. Comm'r of Social Security, 143 F.3d 115, 118 (2d Cir. 1998). The opinion of a treating physician will be assigned controlling weight if it concerns "the nature and severity of [a plaintiff's] impairment(s), is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a plaintiff's] case record[.]" 20 C.F.R. § 404.1527(c)(2). However, the opinions of a treating physician are

---

[23]Plaintiff initially made the broad argument that "[t]he ALJ did not assign weight to the opinion of Dr. Pierce Browning[.]" (Dkt. #14, Brief at 13). However, after defendant highlighted that the ALJ had assigned partial weight to Dr. Browning's July 21, 1998 opinion (Dkt. #15, Brief at 8), plaintiff refined his argument to claim that the ALJ failed to assign weight to the December 1996 opinion. (Dkt. #16, at 2-3).

[24]A notation in Dr. Browning's records that in January 1996 plaintiff "came in and got a copy of his records and his IME[]" (Tr. 281, 397) implies that the prior relationship revolved around a single examination where Dr. Browning served as an independent medical examiner. (Tr. 282, 393, 398).

not afforded controlling weight when they are inconsistent with other substantial evidence in the record, such as the opinions of other medical experts. See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002)(treating physician's opinion is not controlling when contradicted "by other substantial evidence in the record")(citations omitted). Additionally, even if the ALJ fails to assign specific weight to a treating source's opinion, remand is not always necessary if the ALJ "engaged in a detailed discussion of [the opinion's] findings, and his decision does not conflict with them." Jones v. Barnhart, No. 02 Civ. 791 (SHS), 2003 WL 941722, *10 (S.D.N.Y. Mar. 7, 2003), citing Duvergel v. Apfel, No. 99 Civ. 4614 (AJP), 2000 WL 328593, at *11 (S.D.N.Y. Mar. 29, 2002); Walzer v. Chater, No. 93 Civ. 6240 (LAK), 1995 WL 791963, at *9 (S.D.N.Y. Sept. 26, 1995)(additional citations omitted)); see also Seekins v. Astrue, No. 3:11 CV 264 (VLB)(TPS), 2012 WL 4471266, at *5 (D. Conn. Aug. 14, 2012)("[E]ven if the ALJ ignores a treating physician's opinion," remand is not necessary "when the opinion is essentially duplicative of evidence considered by the ALJ, and the report the ALJ overlooked was not significantly more favorable to the plaintiff.")), approved over objection, 2012 WL 4471264 (D. Conn. Sept. 27, 2012), citing Zabala v. Astrue, 595 F.3d 402, 409-10 (2d Cir. 2010).

Here, the ALJ summarized Dr. Browning's opinions from both December 1996 and July 1998, but only assigned weight to the July 1998 opinion. (Tr. 22-23). Plaintiff asserts that he was harmed by the ALJ's failure to assign weight to the December 1996 opinion because "Dr. Browning described [plaintiff's] 'numerous injuries to the ankle' and said that 'there is no question that his total overall impairment is materially and substantially greater because of his dyslexia.'" (Dkt. #14, Brief at 13).[25]

---

[25]While plaintiff quotes Dr. Browning's report as stating that plaintiff suffered "numerous injuries to the ankle" (Dkt. #14, Brief at 13), this language does not appear anywhere in the

The Court finds that plaintiff was not harmed by the ALJ not assigning weight to the December 1996 opinion. Despite Dr. Browning's statement that "there is no question that [plaintiff's] total overall impairment is materially and substantially greater because of his dyslexia[,]" Dr. Browning did not diagnose or treat plaintiff for this condition; rather, he was an orthopedist who had previously seen plaintiff for hand-arm vibration syndrome. (Tr. 282). His assertion about the effect of plaintiff's dyslexia is based only on a broad reference to plaintiff's "past history[,]"[26] and Dr. Browning notes that "despite this, [plaintiff] worked with the handicap and he was able to get a degree from the University of New Haven." (Id.). Because the Court is convinced that the "application of the correct legal standard could lead to only one conclusion[,]" the Court will not remand the case on this issue.  Zabala, 595 F.3d at 409 (internal quotations and citations omitted).

Plaintiff also takes issue with the ALJ's failure to assign specific weight to Dr. Browning's opinion regarding plaintiff's ankles. (Dkt. #14, Brief at 13; Dkt. #16, at 2-3). While Dr. Browning discussed plaintiff's ankles, he made no statements regarding the degree to which the conditions he observed would impair plaintiff. (Tr. 282-83). Additionally, the ALJ accurately summarized Dr. Browning's findings that plaintiff's right ankle was a "bit swollen" and exhibited tenderness at the medial malleolus and that both of his ankles had evidence of anterior spurs on the talus. (Tr. 22; see also Tr. 282-83). Dr. Browning also makes clear in his December 1996 opinion that he had not yet reviewed all

---

report. (See Tr. 282). However, the Court will assume that plaintiff was referring to Dr. Browning's comment that plaintiff "had multiple injuries to the ankles, falling in staging and twisting it on the railroad tracks, etc." (Id.).

[26]It is not clear on which medical records Dr. Browning was relying in forming this opinion since he also refers to plaintiff suffering from attention deficit disorder (id.), a condition which is not mentioned elsewhere in the administrative transcript. See note 12 supra.

of plaintiff's relevant medical history. (Tr. 282 ("He has been treated by Dr. Kaplan, who is a podiatrist, and I don't have the notes from you on that[.]"), 283 ("I would look forward to getting reports from Dr. Kaplan[.]")). In contrast, Dr. Browning's July 1998 opinion, to which the ALJ explicitly assigned partial weight (Tr. 23), was made after Dr. Browning had received additional medical records from plaintiff's podiatrist. (Tr. 281, 397 ("g[o]t records from Kaplan")). Therefore, because the ALJ provided a thorough recitation of the findings of the December 1996 opinion regarding plaintiff's ankles, and because the December 1996 opinion was not significantly more favorable to plaintiff, the Court finds that any error was harmless and remand is not necessary.   See Seekins v. Astrue, 2012 WL 4471266, at *5.

Finally, plaintiff claims that plaintiff's "treating providers have consistently described conditions which show that [plaintiff] has severe physical illness, including White Finger Syndrome (Tr. 289, 294, 300, 306), Bilateral Knee Injuries (Tr. 282, 311, 316), Bilateral Ankle Injuries (Tr. 289, 304) and Osteoarthritis of Right Hand (Tr. 464), and they have described limitations which preclude working." (Dkt. #14, Brief at 13).

The Court notes that plaintiff provides no support for his statement that treating physicians "have described limitations which preclude working" and that every citation that plaintiff provides to support his claim that his treating providers have "consistently described conditions which show that [plaintiff] has severe physical illness[]" is flawed or incorrect. (Id.). Of the four citations plaintiff provides to support his allegedly severe WFS (id., citing Tr. 289, 294, 300, 306), one citation contains no mention of WFS (Tr. 306 (discussing an injury to plaintiff's elbow)), another citation describes a medical visit in 1988 at which plaintiff was suspected of having WFS but not formally diagnosed with the

condition (Tr. 300 ("Nature of Injury: ? White Finger")), and in the last two citations to Dr. Willetts' May 1999 opinion, he notes that plaintiff had previously been evaluated for WFS but concludes that plaintiff could perform work without restriction. (Tr. 289, 294). Similarly, of the three citations plaintiff provides to support his allegedly severe bilateral knee injuries (Dkt. #14, Brief at 13, citing Tr. 282, 311, 316), one citation makes no reference to plaintiff's knees (Tr. 311 (discussing an injury to plaintiff's right heel)), the second citation references Dr. Browning's December 1996 report in which he concludes that plaintiff's right knee "grinds a little bit[,]" but identifies no other issues (Tr. 282), and the final citation discusses a "contusion, abrasion" to the left knee that plaintiff sustained on the job in March of 1991, prior to the alleged onset date of disability. (Tr. 316).

This trend of sloppy citations continues with the two medical records plaintiff references in support of his allegedly severe bilateral ankle injuries. (Dkt. #14, Brief at 13, citing Tr. 289, 304). Plaintiff first cites to Dr. Willetts' May 1999 opinion in which plaintiff reported ankle conditions (Tr. 289, 378, 442), but, upon examination, Dr. Willetts found plaintiff's ankles to be normal (Tr. 291, 380, 444) and explicitly opined that he did "not believe that [plaintiff] is disabled by virtue of his . . . ankles." (Tr. 293, 382, 446). Plaintiff next cites to a sprained ankle that he sustained on the job prior to his alleged onset of disability and that was treated by wrapping the ankle for three days and taking Motrin for five days. (Tr. 304). Finally, plaintiff claims that he suffers from allegedly severe osteoarthritis in his right hand (Dkt. #14, Brief at 13, citing Tr. 464), but his sole supporting citation is from nearly eleven years after the relevant time period and notes only "minor arthritic change." (Tr. 464).

The Court is similarly unimpressed by plaintiff's support for his claim that his treating physicians' opinions "are well supported by . . . objective test results (Tr. 270, 464)." (Dkt. #14, Brief at 13). His two supporting citations for this claim consist of the previously mentioned report from eleven years after the relevant period in which only a "minor arthritic change[]" was noted in plaintiff's right hand (Tr. 464), and a sleep apnea test which revealed a moderate degree of obstructive sleep apnea but noted that plaintiff's "[s]leep architecture" was "relatively well preserved." (Tr. 270-71).  Therefore, the Court will not remand the case on this ground.

### D. WORKERS' COMPENSATION BENEFITS

Plaintiff argues that the ALJ erred because plaintiff had previously received benefits under the Longshore and Harbor Workers' Compensation Act and the ALJ "did not give the prior Administrative Decision any weight." (Dkt. #14, Brief at 14). Plaintiff concedes that "[t]]he ALJ may not be obligated to give this prior decision controlling weight[,]" but argues that "the ALJ did need to consider it, and assign some amount of weight to this Decision." (Id.).

A determination regarding disability made by another agency is not binding on the Commissioner "because other agencies may apply different rules and standards . . . for determining whether an individual is disabled[.]" Social Security Ruling ["SSR"] 06-03p, 2006 WL 2329939, at *7 (S.S.A. Aug. 9, 2006). However, because these decisions "may provide insight into the individual's mental and physical impairment(s)[,]" "evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered." Id. at *6-7.

30

In this case, as defendant points out (Dkt. #15, Brief at 9), the ALJ considered plaintiff's benefits under the Longshore and Harbor Workers' Compensation Act. (Tr. 21-22). While plaintiff seems to argue that the ALJ was obligated to explicitly "assign some amount of weight" to this prior decision, the supporting authority he provides does not support this position (Dkt. #14, Brief at 14), nor does the relevant case law. See Claymore v. Astrue, 519 F. App'x 36, 38 (2d Cir. 2013)(summary order)("Nonetheless, we find no error where, although not specifically mentioned, the VA determination was clearly considered by the ALJ, who thoroughly discussed the other VA records in its findings."). Finally, the Court notes that plaintiff has not cited to any information within the previous disability determination that would affect the ALJ's analysis.[27]  Therefore, the Court finds that the ALJ properly considered plaintiff's receipt of benefits under the Longshore and Harbor Worker's Compensation Act.

E. CREDIBILITY ANALYSIS

Plaintiff claims that the ALJ erred because his credibility analysis "is based on erroneous reasons, and is therefore not supported by substantial evidence." (Dkt. #14, Brief at 14-15).

"It is the role of the Commissioner, not the reviewing court, to resolve evidentiary conflicts and to appraise the credibility of the witnesses." Cichocki v. Astrue, 534 F. App'x 71, 75 (2d Cir. 2013)(summary order)(internal quotations & citation omitted).  The Court will show "special deference[]" to a credibility determination made by an ALJ "who had

---

[27]The prior decision awarding plaintiff disability benefits under the Longshore and Harbor Worker's Compensation Act is the result of a settlement agreement between plaintiff and his former employer. (Tr. 278-79, 391-92). While an ALJ approved the proposed settlement, he did not provide an analysis of plaintiff's conditions. (Id.).

the opportunity to observe the witnesses' demeanor." <u>Yellow Freight Sys., Inc. v. Reich</u>, 38 F.3d 76, 81 (2d Cir. 1994)(citations omitted).

Plaintiff alleges error because "[t]he ALJ referenced [plaintiff's] activities of daily living" to support his finding that plaintiff was not entirely credible. (Dkt. #14, Brief at 15).[28] However, as defendant points out (Dkt. #15, Brief at 10-11), after the ALJ found that plaintiff's alleged symptoms suggest a greater severity of impairment than can be shown by objective medical evidence alone, he properly considered other factors relevant to plaintiff's symptoms, including his activities of daily living, as required by 20 C.F.R. § 404.1529(c)(3). (Tr. 24-25). In doing so he accurately stated that plaintiff could drive a car, perform household chores and yard work, care for farm animals, shop, and help care for his children. (Tr. 24). The ALJ also considered the objective medical evidence of plaintiff's impairments, the nature, duration, and location of plaintiff's reported pain, the effectiveness of medications and other treatments to relieve plaintiff's symptoms, and plaintiff's continued efforts to work. (Tr. 24-25).[29] While plaintiff testified that he could perform this work quicker if he was not impaired, the ALJ still followed the regulations when he considered plaintiff's reported activities of daily living as one of a myriad of factors to determine plaintiff's credibility. (<u>Id.</u>). The ALJ conducted a thoughtful and thorough credibility analysis that does not warrant remand.

---

[28]Defendant generously states that "[p]laintiff argues that the ALJ placed too much weight on [p]laintiff's activities of daily living." (Dkt. #15, Brief at 10). However, a close reading of plaintiff's brief reveals that he is not arguing that the ALJ assigned these activities too much weight. Rather, plaintiff appears to be arguing that the ALJ's credibility analysis is flawed because he considered these activities at all. (Dkt. #14, Brief at 15).

[29]Plaintiff also argues that the ALJ erred because plaintiff "has an excellent work record." (Dkt. #14, Brief at 15). However, the ALJ considered plaintiff's continued efforts to work but found that other factors contradicted his assertion that he was completely and totally disabled. (Tr. 25).

F. RFC DETERMINATION[30]

Plaintiff first claims that the ALJ assigned Dr. Willetts' opinion great weight but did not address his statement that plaintiff's dyslexia was "significantly disabling in the workplace." (Dkt. #14, Brief at 16).[31] Plaintiff is correct that Dr. Willetts stated that plaintiff's dyslexia was "significantly disabling in the work place." (Tr. 296, 385, 449). However, as discussed above, he ultimately concluded that plaintiff was not disabled and could work without restriction. (Tr. 294, 383, 447). Additionally, the ALJ addressed plaintiff's dyslexia when formulating his RFC and included a limitation that plaintiff could not perform work that required more than occasional paperwork. (Tr. 26). Therefore, the Court finds that the ALJ did not ignore Dr. Willetts' opinion when crafting plaintiff's RFC.

Next, plaintiff claims that "the ALJ did not consider [plaintiff's WFS.]" (Dkt. #14, Brief at 16-17). This claim also is incorrect. The ALJ explicitly addressed plaintiff's WFS and, as a result of this condition, included limitations in the RFC so that plaintiff must

---

[30]Before turning to the substance of plaintiff's arguments that the ALJ erred in determining his RFC (Dkt. #14, Brief at 15-18), the Court notes that plaintiff claims that "Defendant's Regulation, 20 C.F.R. § 404.1520(a)(4)(v) states that the ALJ will determine the claimant's Residual Functional Capacity at Step Five." (Dkt. #14, Brief at 16). When evaluating disability, the Regulations make clear that RFC is "assess[ed] [before the Commissioner] go[es] from step three to step four[.]" 20 C.F.R. § 404.1520(a)(4). As defendant points out (Dkt. #15, Brief at 11-12), "[t]his difference is significant because a claimant has the burden of proof from steps one through four of the sequential evaluation." (Dkt. #15, Brief at 12, citing 20 C.F.R. § 404.1512(a))(additional citation omitted). The five-step sequential evaluation process is one of the cornerstones of Social Security disability determinations.

[31]The Court will assume that this is the argument that plaintiff intends to make. However, the portion of plaintiff's brief dedicated to this argument merely summarizes that the ALJ gave great weight to Dr. Willetts' opinion and Dr. Willetts' opinion includes his finding that plaintiff's dyslexia is "significantly disabling in the workplace." (Id.). There is no specific allegation of error or even a discussion of the ALJ's RFC as it relates to Dr. Willets' statement regarding dyslexia. The Court surmises that this is the intended argument based on language later in the brief which states that "as discussed above, the ALJ assigned 'great weight' to the opinion of Dr. Whillets [sic], yet, he essentially ignored that opinion when formulating [plaintiff's] RFC description." (Id. at 17).

avoid exposure to vibrations and perform no more than frequent handling, fingering, and feeling throughout the workday. (Tr. 26).[32]

Finally, plaintiff claims that the ALJ did not properly defer to Dr. Willetts' opinion that plaintiff was precluded from positions which required prolonged standing and walking. (Dkt. #14, Brief at 17-18). However, plaintiff selectively quotes Dr. Willetts' opinion to support his position. (Id.). The entirety of Dr. Willetts' opinion about plaintiff's limitations states: "I believe he could work without restriction. If his history [is] correct, he might experience some discomfort were he to do prolonged standing or walking, but he would be capable of doing that." (Tr. 294, 383, 447)(emphasis added). Therefore, the Court finds that the ALJ's RFC was consistent with Dr. Willetts' opinion and is not a cause for remand.

G. DEFENDANT'S BURDEN OF PROOF

Finally, plaintiff claims that defendant has not met her burden of proof at Step Five of the sequential evaluation process because she "has not presented credible evidence that [plaintiff] could actually perform any job in the State of Connecticut, with his actual RFC, because the RFC that the ALJ used was well beyond [plaintiff's] abilities." (Dkt. #14, Brief at 18-19). Since this argument assumes that the ALJ's RFC was flawed, and the Court has already found that the RFC was supported by substantial evidence, we do not need to address this argument.[33]

--------

[32]Because plaintiff's claim that the ALJ did not consider plaintiff's WFS when formulating his RFC is incorrect, the Court need not address the remainder of this argument. However, the Court notes that plaintiff continues to misrepresent the record. (Dkt. #14, Brief at 16 (asserting that Dr. Willetts diagnosed plaintiff with WFS when Dr. Willetts only stated that plaintiff "was said to be positive for white finger[]")). (Tr. 289, 378, 442).

[33]Finally, the Court issues a word of warning to plaintiff's counsel. As demonstrated above, plaintiff's briefs were completely inadequate; they contained contradictory and illogical arguments,

VI. CONCLUSION

For the reasons stated above, plaintiff's Motion to Reverse the Decision of the Commissioner (Dkt. #14) is **denied**; and defendant's Motion for an Order Affirming the Decision of the Commissioner (Dkt. #15) is **granted**.

The parties are free to seek the district judge's review of this recommended ruling. See 28 U.S.C. §636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).

---

typographical errors that rendered some sentences incomprehensible, unsupported statements, incorrect citations to the record, false recitations of the law, and frivolous allegations of error. Additionally, this is not the first time that the Court has upbraided plaintiff's counsel for her insistence on advocating meritless arguments. See Wilson v. Colvin, 3:13 CV 1661 (RAR)(DJS), Dkt. #27, at 7 ("In fact, plaintiff's counsel has filed many briefs in this court making the same argument, and has been informed several times that her argument is unfounded.")(discussing cases), approved absent objection, Dkt. #28 (D. Conn. May 2, 2016).

Plaintiff's counsel has chosen a noble field of law to pursue. The Court applauds her choice to represent clients with physical and mental impairments who believe they have been improperly denied disability benefits. These claimants are often in financially perilous situations and the benefits at issue in these cases can have a substantial impact on the quality of their lives. Accordingly, they deserve zealous and exceptional advocacy. Unfortunately, the pleadings submitted in this case denied the client of both.

The Court is intimately aware of the large number of disability benefit appeals and the voluminous administrative transcripts that accompany them. As such, the Court is sympathetic to anyone toiling in this field. However, the type of work submitted by plaintiff's counsel wastes the Court's time by forcing it to address a multitude of frivolous arguments and delays the Court's ability to efficiently issue rulings in these cases. This delay ultimately harms all claimants.

Therefore, plaintiff's counsel is warned that the continued submission of such substandard pleadings may result in the imposition of monetary or other sanctions.

Dated this 28th day of September, 2016 at New Haven, Connecticut.


_/s/Joan G. Margolis, USMJ____
Joan Glazer Margolis
United States Magistrate Judge